Welcome to the third day of our panel sitting here in Atlanta. Judge Lagoa, Judge Wilson and I are happy to be here. You're familiar with, I hope, with our traffic light system. Yes, sir. When the yellow light goes on, that means that your time is starting to draw to a close, so please begin to wrap up. If we take you beyond the red light, don't worry, just keep going. You'll be on our time and not yours. We have three cases today. The first one is number 25-11469, Florida Immigrant Coalition et al. v. Attorney General of the State of Florida et al., Mr. D'Souza. Good morning, Your Honors, and may it please the Court, Jeffrey D'Souza for the Florida Attorney General and Florida's prosecutors. I'd like to start briefly this morning by talking about what we think is the most glaring of the standing defects in this case. I'll then turn to conflict in field preemption and, time permitting, talk about the scope of the injunction. So on standing, we've made the argument throughout this litigation that the plaintiff's allegations are insufficiently precise. Now, the response to this is, well, we've told the court that we intend to travel out of the state and come back within the next year. What more could possibly be required? But to illustrate why that's not enough for their standing, I think it's helpful to think in terms of traceability to particular defendants, because they've named all 20 of Florida's state attorneys and the statewide prosecutor, and each named plaintiff would have to, or there at least has to be one named plaintiff who can establish that their injury is traceable to a particular state actor that they'd like to sue. And they just haven't done that because their injuries will only be traceable to prosecutors who could actually bring charges against them, and that would turn on where it is that they take the first provision of SB 4C, which deals with illegal entry into the state of Florida. Their injury will only be in the place where they actually committed the act of entry. But under Florida law, my understanding is that entry like that is a continuous offense, and you can be prosecuted anywhere you're found. Why am I wrong about that? So a couple of things about that, Your Honor. That's still, even accepting the premise that that's what this particular Florida law means when it talks about entry. Well, it doesn't tell me, because it doesn't say, neither provision says where you can be prosecuted, right? That's correct. So the case that they, so first off, I want to emphasize that because this is a pre-enforcement challenge, we don't yet have a great sense of how Florida state courts are going to interpret the term entry here. The case that they're relying on is a very different case that arose in a different context, and it had a different word. The word there was entering, and the court, the state court emphasized the present progressive tense. So there the question was, when does entering the United States end? And I think the court rightly concluded that for the purposes of that statute, it ended when you reached your destination in the United States. We're not talking about that here. We're talking about the term entry. But this statute, like 811.1021, has the enter language. So how is that substantially different, do you think? Because here, the crime occurs, it's a different context, and here the crime occurs when a person enters Florida, enters or attempts to enter Florida. And we think that's just a very different question, and state courts could rightly hold that that means your entry happens at the Florida-Georgia line or the Florida-Alabama line. But if you don't know where the person entered, where do you prosecute him or her? That's right. If there were a question about where the entry occurred, then another prosecutor could bring the charge. Who? Which prosecutor? Well, I think it would probably be the prosecutor where the person resides.  So VV in Immokalee. So that means that a person could be charged. There's no venue provision in this, in either one of these statutes. And so if the person is found somewhere, there's nothing that indicates that they can't be prosecuted in that jurisdiction. Well, I don't know. I don't think that Florida venue laws would allow prosecutors just anywhere. But take VV. No, the place where they're found. You think a prosecutor in a place where an unauthorized alien is found cannot commence a prosecution here under these statutes? I don't know. I think there's an interpretive question about that, Judge Jordan. But one way or the other, they would still need to allege where it is that they will be. And to date, they've never told us that. But where they're going to be doesn't tell you where they're going to be prosecuted. Because they could tell you, I'm coming in at the Georgian-Florida border at this particular location. You may not catch them there. You may catch them only in... What if there's Lee County, right? Or Leon County? I mean, there's 57 counties. Yeah, there's an interpretive... I think there's an interpretive question that in the pre-enforcement context is very difficult to decide. But what I would say is that a person who lives in Immokalee and doesn't intend to travel to Miami is never going to be prosecuted by... Right, but I thought that... I don't remember if it was VV, but that individual who lives in Immokalee said she was going to travel out of the state. Isn't that the one who traveled for vacation and she was going to go to Georgia? Correct. Right. So you're going to traverse a variety of counties, correct? Back and forth? Well, maybe. Or you may just... We have no idea what their travel plans are because they have an alleged... So I think your time is running, so I think maybe you should move to the preemption arguments. I'm happy to. Thank you, Your Honor. So on field preemption, we think this should be an easy case in light of the U.S. Supreme Court's decisions in cases like Kansas versus Garcia where the court emphasized that field preemption should be the rare case. And in Garcia, the court interpreted, defined the field very narrowly. Here, we think that there are two possible fields at issue. And by the way, I think it's worth stressing as well that the United States agrees... Is Kansas versus Garcia your best case? I think for some purposes, I think, in terms of... It depends on what issue we're talking about, but if you're talking about narrowly defining a field, the way that the court defined the field in Kansas was very narrow. It was the field of information that a person has to give an employer. But the reason that I ask the question is because the court made it pretty clear in Kansas versus Garcia that the scheme that supposedly preempted the Kansas law had, quote, no connection with immigration law, close quote. So the court seemed to be very careful to distinguish that case from Arizona versus the United States. Well, I'm happy to talk about Arizona if Your Honor thinks that that's the most relevant precedent. In Arizona, I would assume that you would concede that alien registration is a field preemption.  Right? Yes. And the two... You don't think that criminal prosecution of unauthorized aliens is field preempted? No, Your Honor. And if that were the... Some entry offenses are prosecuted. Others are taken care of civilly through the removal process. And you think that's... But you think that's not field preempted? Judge Jordan, if that were the right way to think about field preemption, Arizona would have been a really short opinion because the court could have just said in a sweeping holding, look, there's a lot in the INA that touches on all these different areas of immigration law. But that's not what it did. It said there's an area of field preemption dealing with alien registration following from Hines v. Davidovitz. And then it looked issue by issue and analyzed the different sub-provisions of Arizona law for conflict preemption. And I'd point the court to Dekanas v. Bika, which is a case from the 70s, which explained that what the INA is really primarily concerned with is admissibility, regulations, who can enter the country, and then when you're lawfully in the country, the conditions under which you can remain. It's the way for the United States government to give authorization to someone to enter into the country legally or be admissible into the country. That's really what the INA does. And I think it's primarily about the admissibility question. And I would distinguish, Judge Lagoa, between, on the one hand, regulations of who can come and under what conditions, and then regulations of physical entry. So as the government points out in its brief, the only physical entry regulations that the other side has pointed you to are 8 U.S.C. 1325 and 1326. And it's just really a single sentence in those sections that deal with the question of alien entry. So we think that that can't possibly be enough for Congress just to say in a couple of passing subsections of the INA that here is how it is that aliens should enter the country. Now, Plyler v. Doe is a case that we've cited, which has some very helpful language for us. I think Plyler assumes that states could have precisely the kinds of regulations that Florida has adopted because it says that states aren't powerless to deter the influx of immigrants into states illegally. And that's all that Florida has done here. Now, the other field, which is really the field that we think our law operates in, is the field of movement within the country. And the closest case that they have for that, arguing that that is field preempted, is Georgia Latino Alliance. But that case dealt with just really a narrow subset of alien movement more broadly. The way that this court defined the field there was the field of transportation by third parties, harboring and concealment. And there were factors that the court considered there that aren't present here. So 1324C talks about the kinds of officer... I thought also in that Georgia Latino, and you could correct me if I'm wrong, but I thought that the particular federal statute authorized the state to be able to arrest but not prosecute for transporting. That's exactly right. That was a factor that the court thought was significant in Georgia Latino. That provision was 8 U.S.C. 1324C. But that doesn't apply more broadly to what we have here, because 1324C has nothing to do more broadly with the movement of people once they are within the country, which is really the area, it's the field in which Florida SB 4C... So let's say that an unauthorized alien who's previously been removed but is back in Florida in violation of this bill, Senate Bill 4C, but the non-citizen is cooperating with a federal investigation. So in the absence of preemption, I guess a Florida state attorney can preempt the Attorney General of the United States of the criminal proceeding and mandatory detention and frustrate the discretion that's afforded to the Attorney General of the United States, if we accept your argument, right? I don't think so, Your Honor. Let me say two things about that. One is I would dispute the premise, because Florida law actually does an excellent job here, and this is Section 811.102 sub 4A, of respecting any federal defenses that may be out there. So Florida law just adopts federal law. And it's very particular. It says that if the federal government has granted lawful presence or discretionary relief, either temporarily or permanently, that is enough to absolve a person of liability under our statute. Right, but isn't it just as an affirmative defense? Yes, that's true. So, and I was curious about that. So you could be picked up, and then the way I read the statute, you are, I think it's, is it a mandatory hold? I'm not sure that you get bail under the statute. Yeah, that's correct. There's a presumption that the person is dangerous and should be bailed. Right, and then, so you have then an affirmative defense, so it's sort of like a stand your ground move to dismiss the information and assert that a defense? I think that could happen. That would be one route. I mean, again, we're in the pre-enforcement posture, so there are some questions. I understand that, but it seems like a strange, it seems like a strange way to handle it. It causes me some concern. Well, let me add two things to the answer. Number one, they brought a facial challenge. That strategic decision has some consequences for them. That's what Moody v. Net Choice says. So they have to establish under Salerno that our law is invalid in all applications, and there will be many applications of our law where it's not the hypothetical that Judge Wilson posited, and where there's not even a plausible claim of a conflict. Now, the second thing I would say, not only has the federal government filed a brief in this case that said, look, there's no conflict between federal and state enforcement priorities, but Kansas v. Garcia is pretty clear as well that even the possibility of that conflict is not enough, does not even begin to make the case for conflict preemption. This case is governed by the abuse of discretion standard, so given that the few other courts to have addressed similar laws have ruled against the position that you're articulating here, how can we say that the district court committed a clear error of judgment in judging the probabilities of substantial likelihood of success? So, Judge Jordan, we don't believe that's the correct standard of review here. I know that that's your view in cases like Wood. It's not my view. It's the view of the Fifth Circuit. It's just that some colleagues haven't followed it, but if we follow the prior panel precedent rule, our cases from the 50s and 60s say you don't do merits analysis. The Supreme Court has said that, too, in a number of cases. I grant you there are cases going both ways, and I've acknowledged that, too, but the general default principle is you don't do merits review in a preliminary injunction appeal because the judge is weighing probabilities, and that's a quintessential discretionary call unless there's a clear error of judgment. Judge Jordan, first off, let me say, and I think you acknowledged this yesterday morning with my colleague from Georgia, but the cases are, they're all over the place, and this might be an area where the en banc court eventually needs to say something because I think it's an important point, but we think that it has to be de novo review. So, if you look at the U.S. Supreme, the latter U.S. Supreme Court cases, Ocentro is an example of that. The U.S. Supreme Court itself has applied de novo review to the subsidiary legal questions in the same way that courts of appeals always ask whether a preemption question, for instance, is, that's a pure question of law. You ask under de novo review, did the district court get that right? And we think there are important reasons to do that here. So, as an example, PIs have proliferated, I think it's safe to say, over the last decade. This is a huge rule of law problem for states because a district court that wrongfully imposes a PI, as we think happened here, can effectively pause a state's law for potentially years through the pendency of the litigation. It can take years, and the state is irreparably harmed by that, and we think it's important to have de novo review of these kinds of important critical questions to state sovereignty. I would say also, if you're taking your cues from the U.S. Supreme Court, in Arizona, that was a PI case. Now, the court didn't explicitly say it was applying de novo review, but page after page after page of the court's decision appeared to be asking de novo whether or not Arizona's law was preempted. I mean, the problem, I mean, I get the point that you're making as a practitioner and an advocate, and if you're trying to read trends, maybe, but we don't have the luxury of reading trends. The Supreme Court has told us over and over again that if it has not overruled its own precedents, we're to follow them. So, we're dealing with a landscape littered with conflicting decisions, and the difficult question is what to make of that landscape, but I understand your position. Judge Jordan, may I ask a question? Of course. Can we talk about the scope of the injunction? And I know you're over your time, but Judge Jordan's being very kind and letting me ask questions. With regards to the scope of the injunction, can you talk to us about, I mean, the statewide prosecutor, I mean, I'll ask the other side. I mean, I'm sort of surprised that he is involved in this litigation because that really deals with multi-district litigation, and it's very, it sounds like a very, statewide prosecutor has very limited ability to prosecute crimes under the Florida statutes and the Constitution. With regards to the law enforcement officers, what is the evidence that the AG has any control or that their employees are agents of the AG? Because my understanding is that sheriffs are constitutional officers. Correct. Yeah, we think that there is no evidence. The evidence that the district court pointed to was a series of tweets by the Attorney General that included some language, you know, about directing law enforcement to do various things. We don't think that's actually the best interpretation of those tweets. And the law enforcement officers are not parties to this litigation. Correct. The motions panel, I know you say it's wrong. I want you to tell me why. The motions panel thought that the Attorney General didn't have standing to challenge the breadth of the injunction as to non-parties. So tell me why you think the motions panel got that wrong. For several reasons. League of Women Voters is a great starting point. That case holds that the Attorney General always has an interest in defending the constitutionality of state laws, and we can't effectively do that here if we don't have the power to say the injunction was also incorrect in terms of its breadth. Number two, we are, in a very real way, aggrieved by that part of the injunction that targets the non-party law enforcement officers because there's a threat of contempt. The district court found that they are our agents, and thus we have monitoring and oversight obligations that we should not have. So that's a diversion of our resources as an agency where our lawyers spend time having to consult with those non-party law enforcement officers to ensure their compliance. The more you say that, the more it looks like the Attorney General is involved with the law enforcement officers, such that they are his agents. No, only because the district court made you. Precisely. Because the Attorney General, under the Florida Constitution, only can bring coercive actions. It cannot tell the Sheriff of Leon County what to do other than by suing him. Yes, yes, Judge Jordan. The situation only exists because of the over-broad nature of the injunction. We otherwise would not be engaged in that practice because we don't actually exercise any control under Florida law over law enforcement. All right. Thank you very much. You've saved your full time for rebuttal. Mr. Wolfson. Thank you, Your Honors. May it please the Court. Cody Wolfson, ACLU, for the Plaintiff class. I'd like to jump straight into the preemption conversation, and I definitely want to address the Court's questions, for example, about the scope of the injunction. So on field preemption, the standard here is, is there either a dominant federal interest or a comprehensive scheme? We have both. The dominant federal interest here is that for 150 years, the Supreme Court has made clear that there is an exclusive federal authority over entry into the United States. And then there is also this extremely comprehensive scheme addressing all aspects of the question of, when somebody enters without inspection in between ports of entry, what should we do with that person? I think that goes to your point, Judge Jordan, there's a bunch of different provisions, and I want to talk about that a little bit more in the context of conflict preemption. But from the field preemption analysis, that's more than enough, as every single court to address the question has held. That includes the Fifth Circuit. As the other side has pointed out, that opinion was vacated when the decision was taken en banc. But I just want to note the leading argument that was advanced by the State of Texas in its en banc petition was about organizational standing, which is not presented for decision in this case. I take their primary response to be, I guess, two things. Today, they've really pressed the idea that the IMA itself barely touches on immigration, excuse me, on entry issues. But I'll just point out, for example, in Plyler, a case that they are relying on, the court said, quote, the state has no direct interest in controlling entry into this country, that being an interest reserved by the Constitution to the federal government. That's not about admissibility, that is about physical entry. And then there are a wide range of provisions that talk about entry into the United States. It's not just the criminal provisions, it's also, for example, different removal proceedings, both regular and expedited removal. Expedited people who enter between ports of entry and all sorts of relief that specifically is available to people who enter without inspection. That includes asylum. In 1158, the asylum statute, there's specific language speaking to people who enter without inspection, as well as other forms of relief. Things like cancellation of removal, U visas, T visas, that reflect Congress's recognition of all the different policy implications of how we might deal with people who enter without inspection in particular cases. The other primary argument that they're making is that really this is not operating in the field of entry at all, and that's because they've tacked on this additional element of entering into the state of Florida. But that can't be enough to escape field preemption for a number of reasons, including in this court's decision, Judge Wilson, in Georgia Latino, there was an extra element that was tacked on in addition to federal crime, which did not in the least sort of hinder the court from finding field preemption. Unless the court has questions about field preemption, I'll briefly touch on conflict, and then I do want to reach the other issues. On conflict, our point fundamentally is this. As I said, this is a scheme that has addressed in a bunch of different ways all the different values and policies and interests that the federal government might have in a particular case of a person entering without inspection. And it gives the federal government a lot of different tools. Some of them are much more punitive, like the criminal provisions that are duplicated here. Some of them take account of humanitarian concerns or the victims of trafficking or of crime or connections to United States citizens. And the way that Congress squared that circle in this statutory scheme is by giving immense discretion to the federal government to decide which of these tools are we going to use in any given case, or are we, as the court noted in Alabama, not going to use these tools at all. And I think the fundamental flaw— But in terms of conflict preemption, there are other areas of law, I think, where the states are allowed to legislate and to criminalize basically the identical conduct as the federal government does. So what makes this different? We're not talking field preemption. We're talking conflict preemption. What makes this different? Absolutely, Your Honor. I've got two answers to that. So one is I do think that it matters that the interest here is an inherently federal interest. And beyond that, I think it matters that Congress has, in these various provisions, set up a system where we're going to have a lot of different options and put immense discretion in the government to try and balance them. And I think in that way, it looks a lot like the Crosby case, which was cited in this court's decisions and was cited below. That was a foreign policy federal interest, which, again, is in this inherent central area of federal control and interest. And I think what the court says there, that's a conflict preemption case. It says, given that Congress, in this very unique federal realm, has given the president a bunch of tools and then left it at the president's discretion, the state can't come in and say, well, we're now going to take that discretion for ourselves and make the decisions for ourselves. There's a couple attributes of the state law that I want to point out, just going to your point. It's not just that the state here is taking the most punitive of the tools that were given to the federal government. It's also that it's making them even more punitive. Mandatory pretrial detention, that's exactly how we read the statute, and I didn't hear the state to contest that. Mandatory sentences that are higher than even the maximum under federal law. And the state is picking winners and losers among the immigration system. Going to Judge Jordan's question, I mean, with respect to drugs, the state of Florida can decide that possession of ecstasy has a higher penalty than it would in the federal context, correct? Yes. So let me ask you a question about, let's say marijuana, because that's sort of a drug of choice where the states are allowing legalization of marijuana and the federal government still has that as an illegal substance, but it's choosing not to, in most cases now, prosecute for marijuana possession. So how do you deal with that? I mean, it sort of goes to the issue of one of the questions that Judge Wilson asked, which is if the federal government is choosing not to prosecute for illegal entry, but the state of Florida decides, well, we're going to prosecute for illegal entry of someone who's illegally in the country, but also in Florida, in the state of Florida. Sure. So I just want to be really clear that we're not saying that every time there's this kind of overlap between state and federal laws, for example, in the marijuana context, there's going to be preemption. And indeed, of course, every time Congress is passing a statute about something, it has some federal interest that it's advancing. I think that the two attributes that I pointed to before really set this case apart and make it much more like a case like Crosby. Number one, we have this interest here that is inherently federal, really from a constitutional perspective. The other side relies on the Duqanis point. I'd encourage the court to take a look at what Duqanis has to say about immigration. It says immigration is so federal that Congress could not authorize states to pass immigration regulations. That's a completely different context from, for example, drug crimes, where everybody agrees both state and federal governments have parallel authority. And the other thing is, I think that this statutory scheme is very different from just saying we're going to penalize possession of marijuana. Here we're saying there is a complex problem at the border that we're dealing with, which is there are people who are coming in between ports. We both want to deter that, but we also want to acknowledge foreign policy considerations, humanitarian considerations, connections with U.S. citizens. That's a tough thing to do. How do we figure that out? We have one sovereign make the decision about which tools are going to be deployed, and that's the federal government. I just want to briefly make the point, to finish the point about the state statute here, because I do think it's important. The other thing the statute does is pick winners and losers among immigrants and among immigrant communities. And so, for example, there's an affirmative defense if you are eligible under the Cuban Adjustment Act, which is available to certain noncitizens. But there's no similar defense if you're eligible for all sorts of other reliefs under federal law, cancellation of removal or asylum and so forth. It's another example of the state here making its own immigration policy. That's exactly what Arizona said states are not allowed to do. And this law, you know, if you compare it to, for example, Arizona Section 6, all that law was doing was saying state officers would make arrests, but then they would hand the folks over to the federal government. Here we have state officers unilaterally making arrests, prosecutions, pretrial detentions, convictions, mandatory sentences. It's much more extreme than was Arizona struck down on conflict preemption grounds. Can you talk about the scope of the injunction? And I didn't ask your counsel on the other side this question, but about how you deal with the scope of the injunction after CASA v. Trump. Absolutely, I'd be happy to. And then I have a follow-up question to that. So let me start with CASA, and then I want to talk about the Rule 65 issue. So on CASA, we think CASA is no problem for us here. CASA was a statutory interpretation question about the meaning of the Judiciary Act of 1789, and it said that didn't authorize universal injunctions unless they, you know, qualify under the sort of complete relief principle. But it specifically contrasted that with Rule 23, which of course is a federal rule, which has the status of a statute under the Rules Enabling Act. And Rule 23 specifically authorizes classes, and the Supreme Court's been very clear, nationwide classes are appropriate, statewide classes are appropriate. So I think we have no problem under CASA, and they have not challenged the class certification order. How do you deal, though, with the fact that under the system of the Florida Constitution, the AG is responsible for the statewide prosecutor, that's under his authority, but law enforcement officers like the Sheriff of Leon County or the Sheriff of Palm Beach, they are their own constitutional officers with their own budgets, and there is no, you know, agency or employee relationship with the AG. So how exactly, how is it appropriate for the District Court judge to have ordered the AG of Florida to, in essence, supervise these law enforcement officers that are not under his purview? Your Honor, I want to answer that question. Let me, if it's all right, I'd like to talk a little bit more broadly about this scope issue and then get into the specific sort of remedy, which obviously is subject to another appeal. I ask this so you understand, like, in the context of the Jacobson case, which is the Secretary of State, where this court said, look, you have to, and of course, you know, it's an election case, you have to sue all the individuals supervisor of elections in their separate counties if you have an issue with the order of the ballot. Understood, Your Honor. So I want to make four points about the kind of scope issue. So the first is, as Your Honor is noting, this is only a scope issue. The court can affirm the injunction. We have clear standing. No, I understand that, but let's assume that I agree that the injunction is fine. Okay. You know, that doesn't mean that I think the scope is fine. Absolutely. So the second point I just want to make is, it's not entirely clear to me that this issue is going to make any practical difference one way or the other, and that's because if this court issues a published decision saying the law is field preempted, for example, I would hope and expect that police officers would recognize that as the law of the circuit and abide by it even if there's no— I understand that, but the scope from my—I'm speaking for myself only. I think the district court erred. I don't think that you have the ability to order someone who's not a party to you where the person—you're ordering someone who does not have control over that individual to have them do something. You may be correct that practically that's how it would work at the end of the day, but that's not appropriate. I mean, I don't have to affirm legal error. You don't, Your Honor, although I will note that, as Judge Jordan pointed out, there's also a real question about standing here— Well, that standing, that's like Catch-22. I mean, that's like a Kafka novel. Okay. But I do want to address the question. So here's the bottom line from our perspective on Rule 65, is that Rule 65, its plain text covers those who act in concert and participation with the defendants. By those terms, it goes beyond the defendants themselves. Right, but here, the AG never—the only power the AG has under the Florida Constitution is the ability to bring coercive actions. So if a state attorney is doing something improper, the only thing the AG under the state Constitution can do is bring a lawsuit asking the trial court judge to enjoin the state attorney from doing something that they're doing that's improper. That or the governor can remove the state attorney, you know, and there's that process. But other than that, he can't pick up the phone and send a letter and say, hey, you better stop. Okay, Your Honor, I want to sort of tease out two different things because I understand the question. You know, the district court said that the AG in this context has practical control over the law enforcement officers. We think that that is right from a practical perspective. I hear Your Honor's question that you've got major skepticism about that as a matter of law. Let's set that aside. Well, but do you have a statute? Do you have anything, even under the Florida Constitution, that gives that authority to the AG? I don't think you do because, I mean, I happen to know what the Florida Constitution says. I understand, Your Honor. I do think it's a different question for purposes of, say, Ex parte Young as for Rule 65 where the question is really about kind of a practical question about making sure the court can enforce its own orders and that people can't get around it, for example, by coming up with some scheme to evade the court's decision. But I want to be really clear. Rule 65 says agents and it also says those in active concert participation. Those are separate prongs. And what we're primarily pressing here on appeal and which the court found below, active concert participation, I think there's no sense of those terms in their ordinary meaning that would not encompass the close partnership and relationship between police and prosecutors in arresting for a criminal violation and then prosecuting. Again, the AG of the state of Florida is not like the AG of the United States. That's not how it works. So the AG of the state of Florida has his own office, his own attorneys, and they prosecute things throughout the state. They also handle appeals for different agencies. But they are not responsible. I mean, the sheriff of Leon County has his own counsel. The sheriff of Palm Beach has his own counsel. They're the ones who give advice to the sheriff because he is a constitutional officer under the state constitution. Your Honor, I understand. I do want to make clear the AG is not the only defendant here. I understand that, but the AG was ordered to tell the sheriffs and the law enforcement officers that he has no control of what to do and how to act. Your Honor, respectfully, I disagree with that. What the AG and every defendant was ordered to do was to give notice of the court's order. He didn't have to agree with it. He didn't have to command them to do anything. The problem, and this is really the subject of the other appeal, which has not yet been briefed, but the problem with what the AG did here is not that he refused to command law enforcement officers. It's that he told them that there was no lawful, legitimate order binding them. That vitiated the notice he was required to give. And I just don't think, from a practical perspective, that there's any problem with telling a defendant who is himself enjoined to give notice to someone. I think that's particularly true in this case. But also, like, why would the AG have to give notice? Because under your theory, once we issue an opinion or an order, that should be enough and that should be disseminated and law enforcement should know about it. Well, he had to give notice of the district court's opinion, and that's because after the initial TRO was issued, which did reach those in concert and participation with all the district attorneys, excuse me, the prosecutors around the state, there were still arrests happening. And the court was very clear, this is covered by my injunction, but obviously some people... Well, you had a situation where the Attorney General, through tweets and otherwise, was suggesting, if not telling, law enforcement that there really was no valid legal order that stopped them from doing anything. That's exactly... And so the district court, we have to decide whether rightly or wrongly reacted to that. That's exactly right. I do want to emphasize, you know, that question's really not before the court right now, the merits of the contempt decision, which... No, obviously, we're just talking about the scope. We're just talking about the scope. We're not talking about the merits. Yeah, and understood. And so... But the merits of that thing, we're talking about the merits. Yes, yes, you're right. It's not a situation where the AG just didn't do what he was ordered to do, which was provide notice of the ruling. He went beyond not complying and suggested, I'm using the word kindly, suggested to law enforcement officers that there was no valid order and they could go about their business enforcing these statutes. That's absolutely right, Your Honor. And I'll just point out, you know, courts have broad authority over the parties before them in relation to the litigation. You know, I think the district court could have ordered the Attorney General, for example, to put the court's decision up on his website if she was concerned that, you know, the word wasn't getting out or that there was confusion about what the state of the And really there's nothing more that happened here until the Attorney General went out of his way to cast doubt on the very notice he was ordered to provide. I think going back to the Rule 65 issue again, we're within the plain text and it is just common sense. We're not aware of any situation in which police should be allowed to make by any prosecutor anywhere in the state. That makes no sense. And here the judge just took a common sense view. But even if the court has some questions about Rule 65, I do think that the standing issue is a major one. And the Madsen case is basically on all fours. It has to do with a non-party who is enjoined as being in concert with the parties. And the Supreme Court said no standing. So I think that is probably the simplest way to resolve this aspect. And so for all these reasons, we'd ask the court to affirm the injunction in full or if it thinks that the AG lacks standing, to affirm except as to the law enforcement issue and dismiss that aspect of the appeal. Thank you very much. Any questions? Mr. DeSouza, in the absence of an injunction, what law enforcement agents in Florida would enforce the Senate bill? What law enforcement agencies would enforce it? Who would be out there conducting the arrests? So I think there are a few. I think local police, certainly. The sheriffs. The Florida Department of Law Enforcement has arrest authority. So certainly any of those. And there may be some other entities. And local law enforcement agents would be enforcing this bill, this law, in the absence of preemption. Isn't that right? I think that's fair to say, as with any law enforcement. Police officers, members of the state sheriff's offices, these are the people who would be enforcing this law. Right, which is precisely why plaintiffs that wanted to stop that law enforcement activity would be prudent to sue those law enforcement officers, which is a choice they could have done. That's what, in Jacobson, the plaintiffs... Because the state doesn't have immigration officers. The state of Florida doesn't have law enforcement agents. Law enforcement agents who go out and arrest for immigration violations. Isn't that right? Right. We have local law enforcement agents. And this is a criminal law. Yeah, you rely on the sheriffs and the police departments, and you rely on the state attorneys to bring these charges. Well, that's true, Judge Wilson, of all criminal laws. But going to the... Can I ask you a question on the authority of the attorney general? Not with sheriffs, but other local law enforcement? Sure. Who are not constitutional officers? Right. What does Florida law say? I'm not as familiar as Judge Lagoa is with the Florida Constitution on this point. But what does the Florida Constitution say, if anything, about the role of the attorney general vis-à-vis local law enforcement? Say, a city police department that has chosen not to take advantage of an agreement with a county or a municipality sheriff's office. What does Florida law say about that relationship between the AG and those law enforcement officers who are not sheriffs? So, generally speaking, in 99% of instances, in context, the attorney general doesn't have supervisory authority. There are some very narrow instances. Is that constitutional or statutory? There is an absence of authority granted by either the Florida Constitution or Florida statutes. Now, there are some exceptions to that that do not apply here, where the legislature has said to the attorney general, you do have some oversight. But that's not implicated here. So there really just is no agency relationship, contrary to what the district court thought. Now, I know my time is short, and I appreciate your patience. That's okay. You can give him one more minute, Valor, please. That's different than the sheriff of Leon. I'm not picking on the sheriff of Leon County, but the sheriff of Leon County is different than the police department in Hialeah or the police department in Key Biscayne, that they're separate. They're all separate entities. Although I think there's, I mean, Florida has a very strange system of governance sometimes because we have municipalities and counties, and like Miami-Dade County is like its own home charter, which is its own thing. And certainly the AG doesn't have control over, like, the home charter in Miami-Dade County Police Department. It truly is not the same kind of unitary executive that exists in the federal system where the U.S. Attorney General has oversight over the FBI and the U.S. Attorney. So it's very different. And these task forces consist of local, state, and federal law enforcement agents. Under 287G, Your Honor? Well, not exclusively to that statute, but that's normally how these investigations and prosecutions take place. Federal, local, and state law enforcement agents working in cooperation with one another. Well, there certainly are examples of that happening. So where I would close is on the conflict preemption point. Florida has, contrary to their argument, has a distinct sovereign interest in the entry and movement across its borders. That is not a federal interest. That's distinctly a state interest. The field in which our law operates is just the field of movement within our borders. That's all that our law does, and we think that it would be an extraordinary act for Congress to have preempted that, and they haven't identified any statutes that do that. If a state passed a sanctuary law for unauthorized aliens, would that be field preempted? That said what, Your Honor? That said that unauthorized aliens are going to be given the sucker and support of the state, and we are going to try to prevent the federal government from removing them, criminally prosecuting them, et cetera, et cetera, because we think they're valuable members of society. So, Judge Norton, I don't know about field preemption, actually. I think there would be a very clear case for conflict preemption there, and in particular obstacle preemption, because there the state would be frustrating the federal government's ability to police its own laws. This is like California versus Zouk, where the Supreme Court said, if you are just mirroring federal law, taking as an element federal law at the state level, there is no possibility of conflict in terms in that circumstance. So, I think that would be a very different scenario from what we have here. Okay. Thank you both very much. Thank you for your time. Thank you. Thank you. Thank you. Awesome. All right.